UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ENCORE D.E.C., LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>APES I, LLC, a Washington limited liability company, AMERICAN PETROLEUM ENVIRONMENTAL SERVICES, INC., and MICHAEL MAZZA, an individual,<br><br>Defendants. | CASE NO. 14-6006 RJB<br><br>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Defendants' Motion for Summary Judgment. Dkt. 50. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

This case arises from an ongoing dispute among former business partners. Defendants move to summarily dismiss all claims. For the reasons provided, the motion should be granted, in part, and denied, in part.

## I. FACTS AND PROCEDURAL HISTORY

### A. FACTS

Defendant Michael Mazza owns and operates Defendant APES 1, LLC ("APES") and American Petroleum Environmental Services ("American Petroleum"), companies that collect used waste oil. Dkts. 51, at 1 and 59, at 1. Mr. Mazza operated his oil collecting businesses out of a Tacoma, Washington property located at 2117 River Street ("Tacoma property"). *Id.* The collected oil would then be sent to Defendant American Recyclers, LLC ("American Recyclers") for recycling and refining. Dkts. 58, at 5 and 19; 59, at 1. All of American Recyclers' refining work took place at a property located in Portland, Oregon that was leased from Plaintiff Encore D.E.C., LLC ("Encore"), a Nevada limited liability company. Dkts. 58, at 19; 59, at 1. Up until December 2013, American Recyclers was owned 50% by Encore and 50% by APES. Dkts. 58, at 5; 59, at 1. Encore's managing member is Randy Soule. Dkt. 59, at 1.

In 2012 and 2013, there were disputes between Encore and APES about American Recyclers' operations. Dkt. 59, at 2. Encore decided that it no longer wanted American Recyclers as a tenant in the Portland, Oregon property. Dkt. 59, at 2. In the summer of 2013, Encore obtained a court order evicting American Recyclers from the facility by December 31, 2013. Dkt. 59, at 2.

Moving American Recyclers' equipment was going to be a difficult task which could take several months. Dkt. 59, at 2. So, in October of 2013, Encore (Mr. Soule) and APES (Mr. Mazza) entered into discussions about APES purchasing Encore's 50% interest in American

Recyclers and the Portland, Oregon facility for four million dollars. Dkt. 59, at 2. Originally, APES was to pay cash at closing, but in November, Mr. Mazza informed Mr. Soule that he was unable to finance the full amount. Dkt. 59, at 2.

In late November, the parties agreed that two million dollars cash would be due at closing and that Encore would finance the remaining two million, with the balance due in six or seven months. Dkts. 58, at 16-18; 59, at 2. Mr. Soule claims that, at that time, Mr. Mazza informed him that there was a purchaser, Mr. Duane Bushman, for the Tacoma property for two and a half million dollars. Dkt. 59, at 2.

In mid-December, Mr. Mazza informed Mr. Soule that his bank would not approve the transaction as structured. Dkt. 59, at 2-3. Around that time, Mr. Bushman, the third party potential purchaser of the Tacoma property, informed Mr. Mazza he would not buy the property. Dkt. 58, at 21.

Mr. Mazza then proposed to Mr. Soule that, rather than a promissory note due in six or seven months, Encore accept a deed to the Tacoma property along with the two million in cash. Dkt. 59, at 3. According to Mr. Soule, Mr. Mazza offered to assign APES's interest in the two and a half million dollar purchase and sale agreement with Mr. Bushman to Encore. Dkt. 59, at 3. Encore conditioned acceptance of the agreement on: 1) APES agreeing to lease the Tacoma property from Encore for $13,333 per month until the property was sold, and 2) Mr. Mazza personally guaranteeing the rent payments. Dkt. 59, at 3. (Encore decided on $13,333 as the amount of rent due, calculating that it was an 8% return on two million dollars). Dkt. 59, at 3. In regard to the proposition that the Tacoma property could be sold for two million dollars, Mr. Soule testified that he was relying on: that the lease was going to pay him what would be an 8% rate of return until the property sold for two million, Kit Mattson's (the real estate agent who had

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 3

1  the property listed for Mr. Mazza) opinion that the property was worth two million, Mr. Mazza's

2  representations that the property was worth that, and that there was an offer on the Tacoma

3  property from Mr. Bushman for $2.5 million. Dkt. 52-1, at 13.

4       On December 17, 2013, the revised purchase and sale agreement ("PSA") was executed.

5  Dkt. 59, at 3 and 12-22. The closing date was scheduled for December 23, 2013, just six days

6  later. Dkt. 59, at 3 and 14. Encore, as "Seller," agreed to sell its interest in American Recyclers

7  and in the Portland Oregon facility, (identified in the PSA as the "Property") for four million to

8  APES, as "Buyer." Dkt. 59, at 12. The PSA stated that the purchase price was four million: two

9  million paid in cash and, as additional consideration, APES would provide a warranty deed to the

10 Tacoma property at closing. Dkt. 59, at 12. Encore agreed to lease the Tacoma property, at

11 monthly rate of $13,333, to APES until the Tacoma property was sold. Dkt. 59, at 13. As is

12 relevant here, the PSA also provided that:

13     11.    Due Diligence Period. Buyer and Seller shall have a maximum of 20 days
   (the "Diligence Period") from the Effective Date to complete all required due
14     diligence of the Properties and Interest. During this time, Seller and Buyer shall
   provide all documents and other information with respect to the Properties and the
15     Interest as requested by either Party within five (5) days.

16 Dkt. 59, at 14.

17      Encore did not have an appraisal conducted on the Tacoma property, or a Phase 1 or

18 Phase 2 environmental study done on the property. Dkt. 52-1, at 13. It did not consult with any

19 governmental agency or regulatory body about the condition of the property. Dkt. 52-1.

20      Encore requested a copy of the purchase and sale agreement between APES and Mr.

21 Bushman, the potential purchaser of the Tacoma property. Dkt. 52-1, at 18. It was provided. *Id*.

22 After the December 17, 2013 PSA was executed, Encore learned that Mr. Bushman had

23 rescinded his offer on the Tacoma property. Dkt. 52-1, at 16 and 18.

24

On December 19, 2013, Encore, as landowner, and APES, as tenant, executed a month-to-month lease ("lease") for the Tacoma property. Dkt. 59, at 24-33. Mr. Mazza executed a personal guarantee for APES rental payments to Encore for the Tacoma property until the property is sold. Dkt. 59, at 34-35.

On December 23, 2013, the day of closing, at 10:03 a.m., Mr. Soule (of Encore) received an email from counsel regarding the Tacoma property that provided:

> Hi Randy- Please carefully review the title report. It looks like there are several easements you should be aware of, as well as some court cases.
>
> One of the cases involves a settlement with the EPA due to hazardous substances. There is a partial consent decree, which has been recorded against the property, which must be complied with by any owner. I am attaching the relevant sections I found in the title documents about what is required of any owner. The lessee also should be notified in the lease, so Debbie should add a paragraph to the lease with this notification (although clearly Mazza already knows about it). Please let me know if this is of any concern, or if you need any help with this.
>
> If you want me to more fully analyze the easements, let me know as well.

Dkt. 59, at 46. The attachments to the email include what are purported to be portions of the title report for the Tacoma property that include two pages of a Partial Consent Decree recorded with the Pierce County Auditor's under Recording Number 9106100294. Dkt. 51, at 7-8. This Partial Consent Decree was signed by the undersigned on May 10, 1990 in *United States v. Joseph Simon & Sons, Inc., et al.*, Western District of Washington case number 90-5373 RJB. The two pages of the Partial Consent Decree attached to the email include provisions providing:

> 20. Any lease of property contained within the Site shall reference this Partial Consent Decree, state that the lessee's possessory interest in the property is subject to the provisions of this Partial Consent Decree relating to access, institutional controls, and due care, and state that the Settling Defendant and the United States each retain the right to enter the leased property to enforce the terms of this Partial Consent Decree, unless the Settling Defendant notifies the EPA of the lease in a timely manner, and the lessee signs this Partial Consent Decree and agrees to perform the obligations and duties of the Settling Defendant under the Decree for the term of the lease. . .

>   21. Any deed, title, or other instrument of conveyance regarding the Site shall contain a notice that the Site is the subject of this Partial Consent Decree setting forth the style of the case, case number, and court having jurisdiction herein.  Said notation shall notify any potential purchasers or lessees of property contained within the Site that restrictions upon the use of groundwater beneath the Site include a prohibition against pumping of ground water in shallow aquifers for purposes other than monitoring. In addition, said notation shall also notify any potential purchasers or lessees of property contained within the capped portions of the Site that:
>
>   a. hazardous substances remain under the cap at the Site; and
>   b. post-remedial action and use is restricted such that use of the property must never be allowed to disturb the integrity of the cap, or any other component of the containment system or the function of the Site's monitoring system . . . .

Dkt. 51, at 7-8.  Mr. Soule forwarded the email to Mr. Mazza at 10:49 a.m., asking "[p]lease advise what this is?"  *Id.*  Mr. Mazza replied and stated, "Randy, I have no knowledge of this, or any restriction to the property like this.  As I told you earlier per our phone conversation."  Dkt. 67, at 4.

Mr. Soule states that Mr. Mazza didn't ever inform him that the Tacoma property contained hazardous waste or that APES "had a long history of uncorrected code violations that it created on the Tacoma property."  Dkt. 59, at 5-6.  Mr. Soule admits that he did not request any environmental reports or reports regarding compliance with the Tacoma City code because he assumed that if Mr. Mazza had them, he would have disclosed them.  Dkt. 52-1, at 14.

Since 2006, Mr. Mazza had Phase 1 and Phase 2 environmental reports, detailing the contaminants and hazardous waste on the Tacoma property.  Dkt. 58, at 7.  (There is some evidence in the record that the property is located next to a superfund site, the Tacoma Tar Pits Superfund Site, but is not included within the boundaries of the site. Dkt. 62, at 2. It is unclear whether this is a contested issue.)  In any event, despite having those reports, Mr. Mazza testified that at the time he purchased the Tacoma property (2006), he thought that "there were no

1 contamination issues on the property; that the contamination of that general region was such that
2 it was the adjacent pieces of property that were contaminated." Dkt. 58, at 7. Mr. Mazza states
3 that he did not read the either of the Phase 1 or Phase 2 environmental reports. Dkt. 58, at 7. But,
4 he acknowledges that he did hire someone to give him advice on them. Dkt. 58, at 8-9. Mr.
5 Mazza testified that he did not disclose or give to Encore either the Phase 1 or Phase 2
6 environmental reports that he had in his possession. Dkt. 58, at 12. Mr. Mazza states that he did
7 not read any of the documents presented to him for his signature at the 2006 closing when he
8 purchased the Tacoma property. Dkt. 58, at 13. He does not dispute that included within those
9 documents, though, was an addendum to the purchase and sale agreement which he signed and
10 that provided, "[b]uyer and seller acknowledge that the purchase price has been reduced to
11 reflect the presence of hazardous substances on the property." Dkt. 58, at 10-11. He also does
12 not dispute that that addendum provided he would indemnify the seller $500,000 for any clean
13 up liability. Dkt. 58, at 11. Mr. Mazza testified that he did not make any disclosures about the
14 condition of the Tacoma property prior to the closing of the deal with Encore. Dkt. 58, at 14-15.
15      In any event, the closing went forward on December 23, 3013. On December 26, 2013,
16 APES executed a statutory warranty deed conveying the Tacoma property to Encore. Dkt. 52-1,
17 at 29-32. The warranty deed provides that it is subject to, in part, "[t]erms and conditions
18 contained in United District Court cause number C89-155B, C89-489TB, and C90-5373 RJB. In
19 connection therewith Consent Decrees for Settlement were recorded under Recording Nos.
20 9106060099, 9106100294, 9112190201 and 9204160208." Dkt. 52-1, at 32.
21      In February 2014, Encore had an offer from the City of Tacoma to purchase the Tacoma
22 property for $2.3 million. Dkt. 59, at 6. As part of its investigation into the property, the City of
23 Tacoma hired Landau & Associates to investigate potential contamination of the property. Dkt.
24

59, at 6.  Their Phase 1 and Phase 2 environmental reports indicates that in 2005,  Phase 1 and Phase 2 environmental reports were generated  before APES purchased the property in 2006.  Dkts. 58, at 45; 59, at 6.  After the 2014 Phase 2 environmental report indicated that there is hazardous waste and contaminants on the property, the City of Tacoma reduced its offer from $2.3 million to $155,000, based on the cost to remediate the site and cure code violations.  Dkt. 59, at 7.

In February of 2014, Mr. Soule asked Mr. Mazza about the "code violations" referenced by the City.  Dkt. 59, at 7.  They were not disclosed at the December 23, 2013 closing.  Dkt. 59, at 7.  Mr. Mazza acknowledged that there had been ongoing code violation issues with the City of Tacoma for years.  Dkts. 58, at 15; 59, at 7.  (Mr. Soule states that, for example, the primary structure on the property did not have a certificate of occupancy even though it had been built many years before and that the property had to have a fire hydrant installed.  Dkt. 59, at 7.)  Mr. Mazza testified that he had in his possession a 2010 "Plan of Action" and a 2013 "Plan of Action" with the City of Tacoma regarding multiple code violations.  Dkt. 58, at 25 and 32.  The "Plan[s] of Action" stated that APES would correct certain code violations within certain dates.  Dkt. 58, at 25 and 32.  Mr. Mazza did not disclose the "Plan[s] of Action" Encore until Mr. Soule asked about them well after the deal was closed.  Dkt. 58, at 25 and 34.

In June of 2014, Encore began receiving notices of building code violations from the City of Tacoma (and then civil penalties).  Dkt. 59, at 7.  Because under the lease, APES was prohibited from operating the facility in a manner that caused a "violation of any state, local or federal law, regulation, standard or of any condition of any permit, approval or entitlement," (Dkt. 59, at 26) Encore demanded APES correct the code violations.  Dkt. 59, at 8.  APES then ceased making the $13,333 rent payments in June of 2014.  Dkt. 59, at 8.

Encore states that had Mr. Mazza and/or APES disclosed the hazardous waste and contamination present on the Tacoma property, or the ongoing City of Tacoma code violations, "whether in a seller's property disclosure statement or otherwise, Encore would not have accepted the property as payment of $2 million towards the purchase of its Portland, Oregon property and its one-half interest in American Recyclers." Dkt. 59, at 9-10.

Encore states that it has had several buyers interested in the property, but once the extent of the environmental contamination and ongoing code violations are disclosed, the potential buyers back out. Dkt. 59, at 8. Encore has even made a counter offer for $1.4 million, which was rejected. Dkt. 59, at 9.

**B.  PROCEDURAL HISTORY**

On June 22, 2014, Plaintiff filed this case in Pierce County Washington Superior Court. Dkt. 1-2. It was removed based on diversity jurisdiction on August 4, 2014. Dkt. 5.

Encore's Third Amended Complaint makes the following claims: (1) misrepresentation against APES and Mr. Mazza; (2) breach of contract against APES regarding the PSA; (3) breach of contract against APES regarding the lease; (4) negligence against APES and American Petroleum; (5) waste against APES and American Petroleum for activity before the lease; (6) waste against APES and American Petroleum regarding activity after the lease; (7) specific performance against all Defendants regarding the City of Tacoma code violations; (8) indemnification against APES. Dkt. 40. Plaintiff seeks damages, costs, attorneys' fees and for Defendants to specifically perform the 2013 Plan of Action with the City of Tacoma and resolve all code violations. *Id.*

Trial is set to begin on November 30, 2015. Dkt. 43.

**C.  PENDING MOTIONS**

Defendants now move to summarily dismiss Encore's claims, arguing that: (1) the misrepresentation claim fails because the potential future sale price of real estate is not an existing fact upon which Encore could reasonably rely; (2) there was no duty to disclose and no breach of the duty of good faith and fair dealing; (3) Encore's negligence claim identifies no applicable duty; (4) Encore cannot salvage its real estate transaction by turning around and suing a tenant, re-characterizing its claims as a breach of a lease; (5) Encore is not a third party beneficiary of the Plan of Action between Defendants and the City because the Plan is not a contract and does not identify Encore as a beneficiary; (6) no breach of the lease occurred or waste occurred and no indemnification is owed because after APES became a tenant, it continued to use the Tacoma property in the same manner as it previously had, which was permitted in the lease; (7) specific performance is not available because it is not required by the lease, and even if it were, money damages suffice; (8) Defendants cannot be liable for committing waste during the 14 days prior to closing because waste cannot legally be committed by a property's owner.  Dkts. 50 and 65.

Encore responds and argues that:  (1) APES and Mr. Mazza had a non-waivable, statutory duty to disclose groundwater and soil contamination on the Tacoma property to Encore, as well as a contractual duty to respond to Mr. Soule's inquiries, and did neither, which was, at the least, negligent misrepresentation; (2) Mr. Mazza's failure to disclose ongoing code violations and statements that the Tacoma property was worth over two million were also actionable misrepresentations; (3) APES breached its duty of good faith and fair dealing; (4) APES and Mr. Mazza's failure to disclose known environmental contamination in violation of their statutory duty also underpins Encore's negligence claim; (5) the 2010 and 2013 Plans of Action were

1  contracts rather than illusory promises; and (6) the lease contains a broad indemnity provision
2  requiring APES to Indemnify Encore.  Dkt. 57.

3  **D.  ORGANIZATION OF OPINION**

4  This opinion will address Defendants' motion by claims made.

5  **E.  SUMMARY JUDGMENT STANDARD**

6  Summary judgment is proper only if the pleadings, the discovery and disclosure materials
7  on file, and any affidavits show that there is no genuine issue as to any material fact and that the
8  movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The moving party is
9  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient
10 showing on an essential element of a claim in the case on which the nonmoving party has the
11 burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue
12 of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find
13 for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
14 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some
15 metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a
16 material fact exists if there is sufficient evidence supporting the claimed factual dispute,
17 requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty
18 Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors
19 Association*, 809 F.2d 626, 630 (9th Cir. 1987).

20 The determination of the existence of a material fact is often a close question.  The court
21 must consider the substantive evidentiary burden that the nonmoving party must meet at trial –
22 e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.
23 Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor
24

1 of the nonmoving party only when the facts specifically attested by that party contradict facts
2 specifically attested by the moving party. The nonmoving party may not merely state that it will
3 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial
4 to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).
5 Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not
6 be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## II. DISCUSSION

As a federal court sitting in diversity, this Court is bound to apply state law. *State Farm Fire and Casualty Co. v. Smith*, 907 F.2d 900, 901 (9th Cir. 1990). Parties agree that Washington law applies. Dkts. 50 and 57.

### A. MISREPRESENTATION

A Washington plaintiff claiming negligent misrepresentation must prove by clear, cogent, and convincing evidence that:

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

*Ross v. Kirner*, 162 Wash. 2d 493, 499 (2007) (*citing Lawyers Title Ins. Corp. v. Baik*, 147 Wash.2d 536, 545 (2002)). "An omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." *Ross,* at 499.

Defendants' motion to dismiss Encore's claim for misrepresentation should be granted, in part and denied, in part. As to the first element, there are issues of fact as to whether Mr. Mazza and APES supplied information to Mr. Soule and Encore that was false in regard to the

1   environmental condition of the property and in regard to the code violations.  When asked about
2   the Partial Consent Decree that appeared on the title report, on the morning of the December 23,
3   2013 closing, Mr. Mazza stated, "Randy, I have no knowledge of this, or any restriction to the
4   property like this.  As I told you earlier per our phone conversation."  Dkt. 67, at 4.  Mr. Mazza
5   made this statement despite the fact that he had the 2005 Phase 2 environmental report in his
6   possession which discussed the fact that the property was in or near a superfund site, that there
7   was contamination on the property, and that it was subject to consent decrees.  Mr. Mazza also
8   made this representation even though he was also aware that the City of Tacoma had found that
9   there were multiple code violations on the property.  To the extent that the claim is based only on
10  Mr. Mazza's representations that the Tacoma property was worth two million dollars, the claim
11  should be dismissed.  Defendants properly point out that the potential future selling price of the
12  Tacoma property is not an existing fact, but an opinion.  *Nyquist v. Foster*, 44 Wn.2d 465, 471
13  (1954)( holding that where the fulfillment of the thing represented depends on the occurrence of
14  a future event then the representation is not of an existing fact).
15      As to the second and third elements, there are also issues of fact as to whether Mr. Mazza
16  knew or should have known that the information regarding the environmental condition and code
17  violations was given to guide Encore in the business transaction and whether he was negligent in
18  communicating his knowledge of the extent of the environmental contamination and code
19  violations.  As a seller of commercial property, APES was obligated to deliver to Encore a
20  Seller's Disclosure Statement, under RCW 64.06.013, which would have provided information,
21  in part, regarding the property's title, environmental conditions, water rights and other defects.
22  Defendants argue that RCW 64.06.013 does not apply to APES as APES was not the "seller" of
23  the Tacoma property nor was Encore the "buyer" because the property was transferred as
24

consideration for the deal and the statute utilizes the terms "buyer" and "seller." Dkt. 65. Defendants cite no authority for their tortured reading of the statute. The statute does not define "buyer" and "seller." "In construing a statute, this court's primary goal is to ascertain and give effect to the legislative intent." *Ravenscroft v. Washington Water Power Co.*, 136 Wash. 2d 911, 920 (1998) (*citing Bernstein v. State,* 53 Wash.App. 456, 460 (1989)). The meaning of the statute is to be derived from the language used in the statute itself, if the statute is unambiguous. *Id.* "The fact that a word is not defined in a statute does not mean the statute is ambiguous." *Id.* "An undefined term should be given its plain and ordinary meaning unless a contrary legislative intent is indicated." *Id.*, at 921 (*internal citation omitted*). Washington courts look to standard dictionaries to determine the ordinary meaning of words. *Id.*, at 922. Merriam-Webster's Dictionary defines "seller" as a "person or business that sells something" and "sells" as "to give up property to another for something of value (as money)." APES gave up the Tacoma property to Encore for the Portland, Oregon facility and Encore's interest in American Recyclers, both of which are undisputed to be of value. Under this definition, then, APES was a "seller," and obligated under RCW 64.06.013 to provide a Seller's Disclosure Statement.

Considering the fourth element of a negligent misrepresentation claim, Encore has shown that it relied on Mr. Mazza's representations. As to the fifth element, although Defendants argue that Encore was not reasonable in relying on Mr. Mazza'a representations regarding the property's condition, Encore has pointed to sufficient issues of fact on this question. The Court cannot say that reasonable minds could reach only one conclusion on that issue. Certainly, Defendants have not shown that they are entitled to a judgment as a matter of law on the question of reasonable reliance. Lastly, on the final, sixth element, Encore has shown that Mr. Mazza's

representations proximately caused it damages. The motion to dismiss the claim for misrepresentation should be denied.

**B. BREACH OF CONTRACT**

To assert a claim for breach of contract, a plaintiff must allege the existence of a valid contract, a breach of the contract, and damages. *See Meyers v. State*, 152 Wash. App. 823, 827, 828 (2009). Encore makes a breach of contract claim regarding both the PSA and lease. Dkt. 40. There is also reference to the Plan[s] of Action between the City of Tacoma and Defendants in regard to Encore's breach of contract claims. *Id.*

1. PSA

Defendants' motion to dismiss Encore's breach of contract claim based on the PSA should be denied. The PSA provides:

> 11. Due Diligence Period. Buyer and Seller shall have a maximum of 20 days (the "Diligence Period") from the Effective Date to complete all required due diligence of the Properties and Interest. During this time, Seller and Buyer shall provide all documents and other information with respect to the Properties and the Interest as requested by either Party within five (5) days.

Dkt. 59, at 14. There are issues of fact as to whether Mr. Mazza breached this provision of the parties' PSA on December 23, 2013, when Mr. Soule emailed Mr. Mazza requested information about the property, and Mr. Mazza replied "Randy, I have no knowledge of this, or any restriction to the property like this. As I told you earlier per our phone conversation." Dkt. 67, at 4. Encore has shown that there are issues of fact as to whether it was damaged as a result.

Defendants argue that there was no duty to disclose and that there was no breach of the duty of good faith and fair dealing. Dkt. 50. Defendants, however, did have a duty to disclose under RCW 65.04. Further, although in Washington, "there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract," *Keystone Land & Dev. Co. v.*

*Xerox Corp.*, 152 Wash. 2d 171, 177, 94 P.3d 945, 949 (2004), Encore does point to a specific contract provision – section 11 of the PSA. The duty of good faith and fair dealing is implied in every contract. *Badgett v. Sec. State Bank,* 116 wn.2d 563 (1991). There are issues of fact as to whether Defendants violated the duty of good faith and fair dealing in relation to Section 11 of the PSA. Defendants' motion to dismiss this claim should be denied.

    2. <u>Lease</u>

Section 4.2 of the lease between the parties provides that APES will not operate "the facility in such a manner as to . . . cause the violation of any state, local, or federal law, regulation, standard, or of a condition of any permit, approval, or entitlement." Dkt. 52-5, at 24.

Defendants argue that they did not breach the lease because what Encore characterizes as a breach, was a use specifically contemplated by the contract – as a truck facility collecting used oil. Dkt. 50. The lease does provide: "Purpose of Lease: This lease is for the purpose of the lessee using the facility in the same manner in which the facility is currently being utilized, which is mainly as a truck facility collecting used oil, and for each . . . purpose to the extent permitted." Dkt. 52-5, at 23.

Encore argues in its Response that it is claiming that Defendants breached their duty of good faith and fair dealing in relation to section 4.2 of the lease based on the code violations that APES was committing before and after the lease was signed. Dkt. 57. Encore argues that, at the same time APES agreed in the lease not to violate any laws or regulations, it was already operating the facility in violation of various City of Tacoma codes.

There are issues of fact as to whether this violated the duty of good faith and fair dealing. Defendants' motion on this claim should be denied.

    3. <u>Plans of Action</u>

1    To the extent that Encore makes a breach of contract claim as a third party beneficiary based
2 on the City of Tacoma and Defendants' Plan[s] of Action to remediate the code violations,
3 Defendants' motion to summarily dismiss the claim should be granted and the claim dismissed.

4    Defendants properly point out that the plans are not contracts because they are not supported
5 by consideration.  They point to the City of Tacoma building inspector's statement that, despite
6 the Plan[s] of Action in place, the city still has discretion to take enforcement action.  Dkt. 65,
7 (citing Dkt. 68).  Encore fails to point to any consideration given for the plan.  Further, Encore
8 fails to point to any evidence that it was intended as a third party beneficiary.  The claim should
9 be dismissed.

10   **C. NEGLIGENCE**

11   "In order to prove actionable negligence, a plaintiff must establish the existence of a duty, a
12 breach thereof, a resulting injury, and proximate causation between the breach and the resulting
13 injury."  *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wash. 2d 468, 474, 951 P.2d 749, 752 (1998).
14 Duty is the duty to exercise reasonable care, "or, alternatively phrased, the duty to exercise such
15 care as a reasonable person would exercise under the same or similar circumstances."
16 *Mathis v. Ammons*, 84 Wash. App. 411, 416, 928 P.2d 431, 434 (1996).

17    Defendants argue that Encore's claim for negligence should be dismissed because Encore
18 did not identify an applicable duty that Defendants breached.  Dkt. 50.  Encore responds and
19 points to Defendants' violation of RCW 64.06.013 as the duty breached.  Dkt. 57.

20    In Washington, although violation of a statute is not per se negligence under except in
21 limited circumstances not present here, violation of a statute can be evidence that a defendant
22 breached a duty of care.  RCW 5.40.050; *Mathis*, at 416.  "A statute may impose a duty that is

23

24

additional to, and different from, the duty to exercise ordinary care." *Id.* A statute has this effect when it meets a four-part test set out in the Restatement (Second) of Torts:

> The statute's purposes, exclusively or in part, must be (1) to protect a class of persons that includes the person whose interest is invaded; (2) to protect the particular interest invaded; (3) to protect that interest against the kind of harm that resulted; and (4) to protect that interest against the particular hazard from which the harm resulted.

*Id.*

Here, RCW 64.06.013 meets this test. Encore, as a purchaser, is in the class of persons the statute is intended to protect. RCW 64.06.013's purpose was to protect the interest invaded against the particular hazard from which the harm resulted. There are issues of fact as to whether Defendants failure to comply with RCW 64.06.013 proximately caused damage to Encore. This claim should not be dismissed.

**D. WASTE**

Defendants' motion to summarily dismiss Encore's claims for waste (Dkt. 50) should be granted. Encore does not respond to the motion to dismiss this claim.

**E. SPECIFIC PERFORMANCE**

Defendants' motion to summarily dismiss Encore's claim for specific performance (Dkt. 50) should be granted. Encore does not respond to the motion to dismiss this claim

**F. INDEMNIFICATION**

Encore seeks indemnification from Defendants pursuant to section 7.3 of the lease. Dkt. 40. That lease provision provides:

> 7.3 Indemnity. Lessee will indemnify, defend, protect, and hold harmless Landowner against costs and other liabilities for physical damage to property, for fines and/or governmental liabilities, for physical injuries or death, for environmental claims, or for claims of nuisance, caused by, in connection with, or in any manner related to, Lessee's operation, maintenance, or repair of the Facility or otherwise related to Lessee's use of or occupancy on the Facility.

Dkt. 52-2, at 25.

Defendants move to summarily dismiss this claim, arguing that Encore seeks to recover for defects which pre-date the lease, which are not recoverable. Dkt. 50. Encore states in its response that even though Defendants agreed to "obtain and comply with all necessary government permits and approvals" it failed to do so and as a consequence, "left Encore with a parcel of property where the primary structure on that property still does not have an occupancy permit." Dkt. 57, at 24.

Based this response, then, Encore seeks indemnification from Defendants of damages resulting from the City of Tacoma code violations. It is unclear which code violations remain, aside from the violation based on the occupancy permit, but, to the extent that Plaintiffs seek to recover for ongoing code violations which occurred while Defendants were leasing the Tacoma property, this claim should not be dismissed.

### III.   ORDER

Therefore, it is hereby **ORDERED** that:

Defendants' Motion for Summary Judgment (Dkt. 50) **IS:**

- **GRANTED as to:**
    - Encore's claim for misrepresentation to the extent that the claim is based on representations that the Tacoma property will sell for two million;
    - Encore's claim for breach of contract claim to the extent it is based on the City of Tacoma and Defendants' Plan[s] of Action to remediate the code violations
    - Encore's claims for waste;
    - Encore's claim for specific performance; and

- **DENIED in all other respects.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 20th day of August, 2015.

_____
ROBERT J. BRYAN
United States District Judge

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 20